UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE TRAVELERS INDEMNITY COMPANY as successor in interest to GULF INSURANCE COMPANY,<br><br>               Plaintiff,<br>  v.<br><br>EXCALIBUR REINSURANCE CORPORATION f/k/a PMA CAPITAL REINSURANCE COMPANY,<br><br>               Defendant. | CIVIL ACTION NO.:<br><br>3:11 - CV- 1209 (CSH)<br><br><br>APRIL 8, 2013 |

**RULING ON DEFENDANT'S MOTIONS TO COMPEL DISCOVERY**

**HAIGHT, Senior District Judge:**

In this diversity action for breaches of contracts and treaties of reinsurance, Defendant Excalibur has made two motions [Docs. 42 and 75] for orders compelling Plaintiff Travelers to produce discovery materials in areas which Travelers contends are placed by governing law beyond the reach of any legitimate adverse inquiry. This Ruling resolves both motions.

The facts giving rise to this action, and the core disputes presented by Excalibur's motions to compel discovery, are stated in the Court's Memorandum and Scheduling Order [Doc. 78] which set the motions down for oral argument. Familiarity with that Memorandum is assumed, and the relevant background is not restated here. The issues have been elaborately briefed. The Court heard oral arguments by counsel on February 26, 2013. Mr. Goldstein argued the cause for Excalibur, the movant for discovery, and Mr. Farrish argued the cause for Travelers, which opposes it. I have

studied the transcripts of these arguments and, given their high quality, derive from them aids to the Court's understanding which augment and supplement the prior briefs of counsel.

One is immediately struck by the fact that on February 7, 2013, 19 days before this Court heard oral argument in the case at bar, the New York Court of Appeals decided *United States Fidelity & Guar. Co. v. American Re-Insurance Co.,* 20 N.Y.3d 407, — N.E.2d —, 2013 N.Y. Slip Op. 00784, 2013 WL 451666 (Feb. 7, 2013) ("*USF & G*"). The opinion of Judge Smith, writing for a unanimous Court, first undertook to "identify some rules of law that govern the allocation of settlement payments for reinsurance purposes." 2013 WL 451666, at 7.[1] As did *USF & G*, the case at bar turns upon the propriety and effect of "the allocation of settlement amounts for reinsurance purposes." Moreover, the rulings of New York's highest Court in that and other cases are, to the extent applicable, binding upon this Court in this case. The treaty of reinsurance to which Travelers and Excalibur are parties provides that it "shall be governed and construed according to the laws of the State of New York," Art. 25, p. 21. In consequence, the appellate court exercising the maximum degree of control over a diversity case before this federal district judge sitting in Connecticut is the New York Court of Appeals, not the Second Circuit, to whose oversight I am more accustomed. In short: if the Court of Appeals' rulings in *USF & G* are applicable to the issues in the case at bar, they are binding upon me.

One may approach the problem by identifying the cast of characters that are found in this familiar reinsurance law drama. There is the *Claimant*, an entity or individual allegedly damaged

---

[1] The page numbers accompanying quotations in text from the *USF & G* opinion are taken from the pdf format version that the Westlaw system prints out when asked to do so. For some reason, that version does not include Westlaw's customary practice of designating pages by the mark *.

by the conduct of the *Insured*.  The Insured's liability for that conduct is covered by a policy issued by a third character, the *Insurer/Reinsured*.  That character plays two roles in the cast: in addition to being the Insurer of the Insured's liability, it has also, stepping into the role of the Reinsured, ceded part of that coverage to a fourth character, the *Reinsurer*.  The interactions of these four main characters are set in motion by the intervention of a fifth character, in a *deus ex machina* role: the reinsurance doctrine called *Follow the Settlement*.[2]

The drama begins when the Claimant, or as in this case a group of Claimants, asserts that the Insured's conduct damaged it.  Those claims, again as in this case, run into the millions of dollars.  The Insured blanches and looks to the Insurer to pay the claims.  The Insurer blanches, assumes the role of the Reinsured, and looks to the Reinsurer or Reinsurers[3] for contributions to those payments.  The Reinsurer blanches and looks for a reason not to pay them.

A number of potential disputes are inherent in this scenario.  Is the Insured liable to the Claimant?  If the Insured is liable to the Claimant, does the insurance policy between the Insured and the Insurer cover that liability?  If that policy covers the Insured's liability to the Claimant, so that the Insurer must pay under it, and more than one Reinsurer is involved in a reinsurance treaty with the Insurer (now cast as the Reinsured), what is the proper allocation among the several Reinsurers of their obligations to contribute to the payments made by the Insurer?

---

[2] In *North River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 136 n.2 (2d Cir. 2004), the Second Circuit said: "The district court used the phrase 'follow the fortunes.' The parties use the narrower phrase 'follow the settlements,' which essentially describes the follow-the-fortunes doctrine in the settlement context." In *USF & G*, the New York Court of Appeals chose to use "follow the settlements" instead of "follow the fortunes," and so do I in the case at bar.

[3] I use the plural "Reinsurers" because often, as in this case, under a reinsurance "treaty" an Insurer has ceded to more than one Reinsurer portions of its potential liability to the Insured during a particular period of time.

It sometimes happens that the initial, underlying issues presented are resolved by settlement, leaving only the last issue – allocation of payments among reinsurers – for litigation. That is to say: Assisted by the brigades of attorneys who respond to such a situation, the amounts of the Claimant's claims against the Insured are settled; the question of coverage under the policy between the Insured and the Insurer is settled in favor of coverage; and the Insurer pays out a very considerable sum in respect of the Claimant's claims. At this point the Insurer, now assuming the role of the Reinsured, allocates among its several Reinsurers the amounts it calculates each Reinsurer should contribute to the underlying payments made. The Insurer/Reinsured calls upon Reinsurers to make such allocated payments under the reinsurance policies. If a Reinsurer objects to that allocation, it refuses to pay, peace gives way to war, and litigation results. That is what happened in *USF & G*. That is happening in the case at bar. The decisive question of law is the same in each case.

The underlying claims in *USF & G* were for asbestos-caused illnesses and death. Judge Smith's opinion for a unanimous New York Court of Appeals sets the stage for the decisive question in an introductory analysis it is useful to quote at some length:

> The coverage suit went to trial in 2002, and was settled in June of that year, while the trial was in progress. The settlement required USF & G to pay a total of $975 million to resolve the asbestos claims, plus $12.3 million in fees to counsel for the asbestos claimants. . . .
>
> Having settled the coverage case, USF& G turned to its reinsurers, defendants in this case, with whom it had entered into a "treaty" of reinsurance applicable to the years 1956 through 1962. . . .
>
> USF& G calculated the reinsurers' obligation to it at approximately $391 million, a calculation determined by USF & G's allocation of the settlement payment, which was based on assumptions we will describe below. The reinsurers refused to pay, and this action followed. . . .

> The reinsurers' main arguments are challenges to USF & G's allocation of the settlement payments - i.e., the amounts that USF & G attributed to each of the claims made against it, and to each of the policies under which the claims were made, when it billed the reinsurers. The reinsurers say that USF & G's allocation minimizes the burden on itself and maximizes the cost to the reinsurers, and that the reinsurers are not bound by it. To analyze the issues the reinsurers raise, we must first identify some rules of law that govern the allocation of settlement payments for reinsurance purposes.

2013 WL 451666, at 6-7.

In the case at bar, this Court must pay close attention to the rules of law the Court of Appeals proceeds to identify in *USF & G*. That is because this case, like that one, turns upon the proper "allocation of settlement payments for reinsurance purposes." And the resolution of that issue depends principally upon the proper interpretation of the fifth character in the drama: the Follow the Settlements clause in the reinsurance contracts. The *USF & G* court introduced that character by saying: "The reinsurance treaty at issue here contained, as contracts of reinsurance commonly do, what is often referred to as a 'follow the fortunes' or 'follow the settlements' clause. We will use the latter term." 2013 WL 451666, at 7 (internal citation omitted).

Following that common practice, the two reinsurance treaties in the instant case contain follow the settlements clauses, in like language: "All amounts ceded hereunder will be subject to the same gross rates and to the same clauses, conditions, interpretations, and modifications of the Company's Policies and the Reinsurers will pay losses as may be paid thereon and will follow the settlements of the Company, subject always to the terms and conditions of this Agreement."

The core question in cases such as these is whether a particular Reinsurer (Excalibur in the case at bar) is bound by the allocation of settlement payments among Reinsurers made by the Insurer/Reinsured (Travelers). Enter, at this point in the drama, the Follow the Settlements clause

in the reinsurance treaty. Travelers contends its effect is to bind Excalibur to the amount allocated to Excalibur by Travelers. On this theory, Excalibur is bound to pay the amount allocated to it by Travelers, and no further inquiry into that subject is appropriate or permissible, including the discovery Excalibur seeks by these motions to compel. Excalibur contends the Follow the Settlements clause, when properly construed, does not bar Excalibur from arguing that Travelers' allocation is unreasonable, or that the underlying claims Travelers settled are not covered by the reinsurance contract between Travelers and Excalibur. The discovery Excalibur seeks to compel is in aid of those contentions.

In *USF & G*, the Court of Appeals' formulation of the governing rules of law turned immediately to the follow the settlements clause in the reinsurance contracts, which provided that: "All claims in which this reinsurance is involved, when allowed by the Company [USF & G], shall be binding upon the Reinsurers, which shall be bound to pay or allow, as the case may be, their proportion of such loss." 2013 WL 451666, at 7. This clause is the functional equivalent of the follow the settlement clauses in the case at bar, quoted *supra*. The Court of Appeals' construction of the follow the settlement clause draws an initial distinction between the Insured/Reinsured's settlement of the Claimant's claims, and its subsequent allocation of the settlement amount between Reinsurers. In that regard, the Court of Appeals said in *USF & G*:

> It is well established, and the parties here do not dispute, that a clause like this ordinarily bars challenge by a reinsurer to the decision of a party in USF & G's position – called in reinsurance jargon the "cedent," because it has ceded part of its risk to its reinsurers – to settle a case for a particular amount. That rule usually creates little risk of unfairness because, in deciding whether and for how much to settle, the interests of cedent and reinsurer will normally be aligned; both will want the cheapest settlement possible. . . . [T]he reinsurers do not challenge USF & G's decision to settle MacArthur's [the

> Insured's] lawsuit [on coverage], nor do they assert that USF & G overpaid in the settlement. Rather, they challenge the way the settlement was allocated.
>
> As the reinsurers point out, the application of a follow the settlements clause to allocation decisions raises problems, because in that context the interests of cedent and reinsurer will often conflict. This case can serve as an illustration. Under the reinsurance treaty, the first $100,000 of every loss must be borne by USF & G, and the second $100,000 by the reinsurers. If the settlement were allocated entirely to losses amounting to $100,000 or less, the whole cost would be borne by USF & G and the reinsurers would pay nothing; but if it were allocated entirely to losses of $200,000 each, the reinsurers would bear half the cost. Because conflicts of this kind will occur often, the reinsurers argue, cedents' allocation decisions should not bind reinsurers under a follow the settlements clause.

2013 WL 451666, at 7-8 (internal citation omitted).

Excalibur, the reinsurer in the case at bar, makes essentially the same argument in respect of Travelers' allocation of the claims settlement amounts to the second of the four years in question, during which Excalibur was a reinsurer, rather than to the first year, when Excalibur was not a reinsurer. Excalibur contends that the follow the settlements clause does not bind it to that allocation, and that it remains free to challenge the allocation and hence, its obligation to make any reinsurance payment to Travelers.

The Court of Appeals' decision in *USF & G* must be regarded as something of a disappointment to Excalibur on that particular point, because having summarized the reinsurers' argument in the language just quoted, the Court immediately rejects it:

> There is logic to this argument, but almost all courts to consider the question have held, and we join them in holding, that a follow the settlements clause does require deference to a cedent's decisions on allocation. As other courts have observed, there seems to be no good alternative to giving a measure of deference to a cedent's allocation decisions. To review each decision de novo would invite long

> litigation over complex issues that courts may not be well equipped to resolve, creating cost and uncertainty and making the reinsurance market less efficient. Deference to a cedent's decisions makes for a more orderly and predictable resolution of claims.

2013 WL 451666, at 8 (internal citations omitted).

If the Court of Appeals had stopped there, Travelers would have been able to cite *USF & G* as governing authority mandating summary judgment in its favor. Travelers was the cedent, was it not? And it allocated the settlement payments to claims made during a year when Excalibur was a reinsurer, did it not? And deference is owed, by Excalibur and this Court, to this cedent's allocation decision, is it not?

Well, yes, BUT. The Court of Appeals did not stop there. It went on to identify the second rule of law "that govern[s] the allocation of settlement payments for reinsurance purposes." The *USF & G* opinion continues:

> But to say that a cedent's allocation decisions are entitled to deference is not to say that they are immune from scrutiny. Recognizing that the cedent's and reinsurer's interests will often conflict, courts generally hold that a reinsurer is bound only by a cedent's "good faith" decisions. While that expression might seem to suggest that the cedent's subjective intentions are critical, most decisions also consider reasonableness or some other subjective element. This approach is consistent with our own in *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, (96 N.Y.2d 583, 596-597 [2001]), where we held that a follow the settlements clause "does not alter the terms or override the language of reinsurance policies," and rejected a cedent's attempt to "allocate" to certain reinsurance treaties losses that the treaties simply did not cover.
>
> In our view, objective reasonableness should ordinarily determine the validity of an allocation. Reasonableness does not imply disregard of a cedent's own interests. Cedents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own. As the Third Circuit put it in *Travelers v. INA*:

> "[T]o establish a breach of the duty of good faith, it is not sufficient simply to demonstrate that a particular allocation decision increased the insurer's access to reinsurance, at least not where the insurer is able to point to some legitimate (i.e., non-reinsurance-related) reason for the challenged decision."

(609 F.3d at 158-159).

We mean by "reasonable" essentially what we take the Third Circuit to mean by "legitimate": The reinsured's allocation must be one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist.

. . .

. . . We think it unrealistic to expect that the cedent will not be guided by its own interests in making the choice.

But the choice must be a reasonable one, and we also conclude that reasonableness cannot be established merely by showing that the cedent's allocation for reinsurance purposes is the same as the allocation that the cedent and the insurance claimants actually adopted in settling the underlying insurance claims. The fact that they did adopt it does not prove that they would have, or reasonably could have, adopted it if reinsurance did not exist. In this case, the record shows that the allocation USF & G used in billing the reinsurers was one that it discussed and agreed on in negotiations with MacArthur [the Insured] and the asbestos claimants. We reject USF & G's argument that this in itself establishes the validity of the allocation.

 . . . [I]n many cases claimants and insureds (i.e., those in the position of the asbestos claimants and MacArthur here), far from being indifferent, will enthusiastically support insurers' efforts to fund a settlement at reinsurers' expense. They will do this for the simple reason that insurers, like everyone else, are apt to be more generous with other people's money than [with] their own.

In sum, under a follow the settlements clause like the one we have here, a cedent's allocation of a settlement for reinsurance purposes will be binding on a reinsurer if, but only if, it is a reasonable allocation, and consistency with the allocation used in settling the underlying claim does not by itself establish reasonableness. We now

> consider whether USF & G's allocation decisions in this case were reasonable as a matter of law, thus entitling USF & G to the summary judgment that it was granted by the courts below.

2013 WL 451666, at 8-10 (some citations and internal quotation marks omitted)..

The *USF & G* Court then undertook a review of the evidence, clearly gleaned from a substantial record, that in its view was probative of "whether USF & G's allocation decisions were reasonable as a matter of law." Judge Smith's opinion sets the stage for that inquiry, and previews its conclusion, in the following paragraph, 2013 WL 451666 at 10:

> The significant, disputed assumptions underlying USF & G's settlement allocation were (1) that all of the settlement amount was attributable to claims within the limits of USF & G's policies, and none of it to the claims that USF & G acted in bad faith when it refused to defend MacArthur in asbestos litigation; (2) that claims by claimants suffering from lung cancer had a value of $200,000 each, while certain other claims had values of $50,000 or less; and (3) that USF & G's entire payment should be attributed to the policy in force in 1959 – the last full year in which USF & G was Western Asbestos's liability insurer. We consider whether these assumptions might reasonably have been the basis for an arm's length settlement among the asbestos claimants, MacArthur and USF & G if reinsurance were not in the picture. We conclude that the reasonableness of the first two, but not the third, of these assumptions present issues of fact.

As for the first of these three assumptions, the Court said:

> The decision to allocate all the settlement to claims within the policy limits, and nothing to the claims for bad faith, worked to USF & G's advantage because the bad faith claims were not covered by reinsurance. . . .
>
> There is evidence in the record from which a fact finder could conclude that an allocation giving no value to the bad faith claims was unreasonable.

*Id*. at 10. The Court of Appeals reached the same conclusion with respect to the second assumption. It regarded the third assumption, allocating the entire settlement payment to the last policy year, as

-10-

reasonable with respect to asbestos injuries that "occur gradually, over a period of years in which several liability insurance policies are successively in force," in view of the rule that "all of the damages from such an injury may be attributed to any policy that was in effect during the period in which the injury was suffered." *Id*. at 13.

As a result of these conclusions, the Court of Appeals vacated the lower court's grant of summary judgment to USF & G based on the follow the settlements clause, and remanded the case for trial on the reasonableness of the first two assumptions underlying that insurer/reinsured's allocation of the settlement amount among the reinsurers.

Instruction in the case at bar may also be derived from an earlier decision of the New York Court of Appeals which that Court cited and followed in *USF & G*, 2013 WL 451666 at 9. That case is *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583 (2001). The question presented was "whether losses from environmental injury claims involving decades of commercial activities at numerous industrial and waste disposal sites may properly be aggregated as a single 'disaster and/or casualty' under certain reinsurance treaties." 96 N.Y.2d at 587. The insurer/reinsured, having paid for those losses under its underlying policy with the insured, aggregated them and called upon the reinsurers for indemnification, notwithstanding the fact that the resulting total amount exceeded the liability cap contained in the reinsurance treaties. That limitation made no difference, the reinsured contended: its theory was that "the 'follow the fortunes' clauses found in the reinsurance treaties mandate that the Reinsurers reimburse it for losses it allocates to them reasonably and in good faith." *Id*. at 596. The Court of Appeals rejected that argument. The Court held that "such a clause does not alter the terms and conditions or override the language of reinsurance policies," *id.*, and distinguished cases relied upon by the reinsured, in an analysis that

resonates in the instant case:

> Both cases [cited by the reinsured] deal with challenges by reinsurers to the reinsureds' decision to settle claims based on the terms of the underlying policies.  The courts held that the reinsurers were bound by "follow the fortunes" clauses in their reinsurance agreements and, as a result, the reinsurers had to indemnify their reinsureds as long as the payments were made reasonably and in good faith.  Here, by contrast, the Reinsurers are not contesting Travelers' settlement decisions based on the underlying policies; rather, the challenge is to Travelers' allocation of those settlements *based on the contractual language in the reinsurance treaties*.

*Id*. at 597 (emphasis added).  I emphasize the last phrase because in the case at bar, Excalibur partially bases its objections to Travelers' allocation among policy years upon provisions in the reinsurance treaty.

In the case at bar, the briefs of counsel and their oral submissions focus principally upon Second Circuit decisions.  Meaning no disrespect to that tribunal, the law of New York governs the reinsurance contracts between Travelers and Excalibur, and the New York Court of Appeals is the most authoritative source of what that law is.  When *USF & G* and *Travelers Cas. & Sur. Co.* are read together, these rules of law are made manifest:

(1) A follow the settlements clause in a reinsurance contract requires that deference be given to a cedent's decision on the allocation of settlement payments among reinsurers; however:

(2) A cedent's allocation decisions are not immune from scrutiny, which includes:

(3) Consideration of whether the allocation is a reasonable one, that is, one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at if the reinsurance did not exist; and:

(4) In any event, an allocation by a cedent that violates or disregards provisions in the

reinsurance contract is invalid and cannot be sustained by a court.

The submissions of counsel during oral argument may be viewed in the light of these rules of law. Mr. Goldstein said on behalf of Excalibur:

> Now, the reinsurance contracts at issue provide coverage that follows the . . . E&O policies which provided claims made coverage as opposed to occurrence coverage. Therefore, the claims, subject claims, against [the Broker],[4] the insured, had to first be made during a policy year and under a treaty year, treaty being the insurance contracts at issue, to be covered under those reinsurance contracts.
>
> As a result, under these reinsurance contracts, coverage under the policies, coverage under the treaty and allocation, for want of a better word, are really inseparable. An allocation is a term that could have many meanings, but in this case, effectively, allocation means which policies and which treat years are implicated by these particular claims.
>
> An allocation, in theory, should be driven by a coverage determination. The claim must be covered under a policy to be covered under the reinsurance contract, and because these are claims made policies, if a claim – this is hypothetically speaking – is covered in the first four years of coverage, by definition in that policy that same claim is not covered by the later years. There are, in fact, exclusions in each policy for claims first noticed in a prior policy year. So one policy year is triggered, the later policy years will not

---

[4] In light of the Court's prior Ruling on Plaintiff's Motion to Seal [Doc. 48], dated 5/10/2012, the Court refers to the broker insured named at the oral argument (February 26, 2013) as "the Broker." In that prior ruling, the Court balanced the Broker's interest in maintaining its reputation and keeping its settlement negotiations confidential, as an innocent third party, against the public's interest in access to its identity. Applying the factors articulated by the Second Circuit in *United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1050-51 (2d Cir. 1995), to the facts presented, the Court found in favor of the Broker's privacy and sealed its identity. During the recent oral argument, however, Excalibur's counsel represented that the Broker's difficulties are well known in the British insurance context, are "all over the press in London and in the U.S.," and readily available "on the Internet." Doc. 108 (Sealed Transcript), p. 106, l. 14 to p. 107, l.5. In considering Travelers' recent motion to seal portions of the February 26, 2013 hearing transcript [Doc. 101], the Court has once again been asked to address the issue of whether the Broker's identity should be sealed due to its reputational interest. Pending the Court's Ruling on that motion, the Court will continue to preserve the Broker's identity at this time.

> provide coverage for that same claim. It's not a continuing tort that continues into later policy years. So only the year when the notification is received provides coverage.
>
> In this case, Excalibur did not reinsure Gulf [Travelers' predecessor in interest] for all four years of coverage it provided for [the Broker]. Excalibur did not reinsure Gulf in year one. It did provide coverage in years two, three and four.

Tr. 10-11. I do not understand Travelers to suggest that this description of the contractual scheme is inaccurate. The pertinent provisions seem plain enough. The reinsurance treaties provide that "all amounts ceded hereunder" will be "subject to . . . the same clauses, conditions, interpretations and modifications of the Company's Policies," a reference to the underlying policies between Travelers and the Broker, the insured. Each of those policies provided that "this Policy is limited to indemnity for only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD." They further provide that a claim is "deemed to have been made against the Insured during the Period of Insurance" if "during the Period of Insurance the Legal Department shall first become aware of any circumstance which is likely to give rise to a claim against the Insured. . . " These provisions would appear to lend plausibility – for the present I put it no higher than that – that a claim first made against the Insured during the first year of the four reinsurance years in question cannot validly give rise to reinsurance liability on the part of Excalibur, since it is common ground that Excalibur did not issue reinsurance with respect to that first year. In consequence, an allocation by Travelers that imposes upon Excalibur a reinsurance liability in respect of a first-year claim against the Broker would exceed Excalibur's obligations under the reinsurance treaty, a result that as a matter of law lies beyond the power of a follow the settlements clause.

During oral argument, Mr. Farrish said on behalf of Travelers:

> Now, Excalibur rightly notes that in the beginning of Travelers' understanding of the [Broker's] affairs, it initially thought that the claims that ultimately became the most problematic might relate to the notification that [the Broker] received in year one. Later, Travelers got other information and it changed its mind. It's entitled to do that under the follow-the-fortunes doctrine. Judge Jacobs told us as much in the *British Insurance* decision. . . .
>
> [T]here are people commenting, saying you are not entitled to change your mind, having once held that view you have to hold the view always. But as the *Christiana* case tells us, as the *British Insurance* case tells us, the ceding company gets to make these determinations. It gets to decide whether it capitulates, whether it accepts something that the policyholder is suggesting. You know, in this case, [the Broker's] contention that some of these claims belonged in year two, you know, if a cedent company listens to its policyholder and says, you know, we thought you were wrong, but now that we've listened to you, okay, we get to do that and it doesn't get to be reexamined all over again in this forum. . . . This isn't a situation in which the ceding insurance company, Travelers, is trying to fit an asbestos claim into a dental policy, it's a case where we have a professional liability claim that we've matched up to a professional liability policy, and we get to decide which one.

Tr. 72-74.

These lucid and well-phrased submissions of counsel delineate the core issue with respect to the effect of the follow the settlements clause in the reinsurance contracts.

The case for Excalibur is that as one of the reinsurers, it is entitled in law to challenge the amount Travelers allocated to it on two factual grounds: the allocation was unreasonable in the circumstances, and it imposes a liability contrary to the terms of the reinsurance contracts. The follow the settlements clause does not preclude those challenges. The dates when Claimants' underlying claims were first asserted against the Broker, the Insured, are essential elements of the challenges. Excalibur is entitled to discovery into that and other relevant circumstances.

The case for Travelers is that the follow the settlements clause is binding upon Excalibur, so that Excalibur must accept Travelers' allocation among reinsurers, and cannot challenge, question or inquire into it. That position is vividly revealed by counsel's pithy phrases: "the ceding company gets to make these determinations"; "we get to do that and it doesn't get to get reexamined all over again in this forum"; "we get to decide which one." It follows that Excalibur's requested discovery relates solely to irrelevant or forbidden issues, would not lead to admissible evidence, and cannot be compelled under the federal discovery rules.

While the briefs and arguments of counsel stress Second Circuit decisions, what the Second Circuit believes New York law to be is not as important to me as what the New York Court of Appeals says New York law is. That is why I derive the four rules just stated from *USF & G* and *Travelers Cas. & Sur. Co.,* not from Second Circuit decisions. That is not to say that these tribunals have announced conflicting rules. On the contrary: in *North River Ins, Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134 (2d Cir. 2004), upon which Travelers relies, the Second  Circuit said:

> [T]he court holds that the follow-the-settlements doctrine extends to a cedent's post-settlement allocation decisions, regardless of whether an inquiry would reveal an inconsistency between that allocation and the cedent's pre-settlement assessments of risk, as long as the allocation meets the typical follow-the-settlement requirements, *i.e.*, is in good faith, *reasonable, and within the policy limits*.

361 F.3d at 141 (emphasis added). This summation of rules is in complete accord with New York law as stated by the Court of Appeals in *USF & G* and *Travelers Cas. & Sur. Co.* The emphasized phrase "within the policy limits" in *North River* must be a reference to the reinsurance policy: the Court of Appeals' holding in *Travelers Cas. & Sur. Co.* tells us that.

I conclude that as between these conflicting and irreconcilable contentions of counsel,

Excalibur's position is in accord with New York law and Travelers' is contrary to that law. Excalibur is entitled under the New York Court of Appeals cases to challenge the reasonableness of Travelers' post-settlement allocation decision, and to argue that the economic consequence of that allocation violates or disregards provisions in the reinsurance contract. The discovery Excalibur seeks may lead to evidence admissible on these issues. The legitimate boundaries of the requested discovery exceed the limited disclosures Travelers has previously made. Travelers' protestation that those disclosures are sufficient is based upon its view of the powers in which it is clothed by the follow the settlements doctrine, but I have rejected that application of the doctrine. Accordingly, Excalibur's motions to compel discovery will be granted.

Two additional points must be made. First, nothing in this Ruling is intended to express or intimate any view on the part of the Court with respect to how any of the issues discussed herein will ultimately be decided. This Ruling does no more than to decide that Excalibur is entitled to discovery on the facts relevant to the issues. Whether Excalibur ultimately succeeds on its challenges to Travelers' allocation may depend upon that discovery's fruits, or lack thereof. That question is for another day.

Second, this Ruling is limited to resolving against Travelers the principal objection Travelers made to Excalibur's requested discovery. Other objections are stated in the briefs, such as attorney-client privilege and confidentiality. I do not undertake to decide those issues in this Ruling. Counsel for Travelers must consider whether such objections, standing alone and without the company of the principal objection to discovery, present arguable bases for denying discovery. For example: Travelers has suggested that principles of confidentiality may be invoked to protect the sensibilities of non-parties, such as the Broker Insured. Q*uare* whether that is a viable ground for precluding

discovery by Excalibur, in a situation where I am told the Broker's principals' difficulties are notorious in British insurance and perhaps even social circles. If in the wake of this Ruling Travelers wishes to press alternative grounds for precluding discovery, it must do so in the form of renewed and restated motions. In the event of renewed motions, the Court will need to consider Excalibur's alternative contention that provisions in the reinsurance treaties explicitly mandate Travelers to make much of this material available to Excalibur upon request. It was not necessary for the Court to reach that point in this Ruling.

For the foregoing reasons, Excalibur's motions [Doc. 42] and [Doc. 75] to compel discovery are GRANTED.

It is SO ORDERED.

Dated: New Haven, Connecticut
       April 8, 2013


                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge